15074

C. E. LUTTRELL & CO. v. SOUTHERN RY. CO.

(8 S. E. (2d), 753)

December, 1939.

*Messrs. Frank G. Tompkins* and *W. B. McGowan,* for appellant,

*Messrs. Price & Poag,* for respondent,

May 2, 1940.

The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

The Greenville County Court affirmed the judgment of a magistrate Court for the plaintiff in seven separate cases. These cases rest substantially upon the same facts, and are controlled by the same principles of law. The case at bar is typical of the`others, and, by agreement of counsel, the decision of this case will be determinative of the other six cases.

The litigation arises out of the following facts: The plaintiff, a scrap iron dealer of Greenville, South Carolina, was quoted certain through rates by the defendant for the transportation of seven carloads of scrap iron, originating at various points in North and South Carolina, with the transit or stop-over privilege at Greenville for additional loading and transmission therefrom to ultimate points of destination,

in Alabama and Georgia. The quoted rates were in conformity with tariffs filed with the Interstate Commerce Commission, and promulgated as I. C. C. No. A-10650, and were less than the total of the separate shipment rates computed upon the basis of the tonnage moving from the points of origin to Greenville, the stop-over point, and from Greenville to the points of destination.

The pertinent parts of the tariff (No. A-10650) read as follows:

"Rule 13 : (a) When cars are stopped to partially unload no freight may be loaded at stop-off points.

"(b) When cars are stopped to complete loading no freight may be unloaded at the stop-off points.

"(c) Should there be both a removal of articles and a loading of articles into the car at the stop-off point, the provisions of this tariff will not apply and the inbound shipment will be treated the same as if destined to the stop-off point, and the out-bound shipment will be treated the same as if originating at the stop-off point, and charges assessed accordingly."

When the seven cars of scrap iron reached Greenville, partially loaded, the plaintiff temporarily removed therefrom certain portions of the original lading in each car for the purpose of rearrangement so that the loading might be completed.

The scrap iron was shipped in open gondola cars which have a depth of about four feet, and at the points of origin the cars had been loaded in such a haphazard manner that the respondent found it impossible to complete the load at Greenville without a readjustment. At Greenville the respondent had on hand additional scrap iron which it wished to place on the cars, but it was unable to load this additional scrap iron on the cars without rearranging the freight originally loaded therein. In order to make the loading more compact and to facilitate additional loading, some of the scrap iron was taken out of each car, in variable quantities, and deposited on the ground adjacent to the cars from which it

was removed. It was found necessary to cut certain larger pieces of the scrap iron by the use of a blow torch, in order to help forward the replacing. Every piece of the tonnage removed by the plaintiff was then replaced in the original cars from which it came, and by such arrangement the respondent was enabled to add in the aggregate 178,900 pounds of scrap iron to the loads originally in the seven cars.

The average rate on the various shipments was $3.11 per ton. By reason of the increased tonnage or additional loading at Greenville the defendant received the sum of $278.18 by way of additional freight charges.

The defendant offered no testimony in contradiction of the plaintiff as to the necessity of temporarily removing some of the scrap iron from the cars at Greenville, to facilitate a complete loading at that stop-off point. Nor did it offer any evidence to show that the identical tonnage was not replaced in the original cars from which it had been removed.

Claiming that the respondent had violated the provisions of Rule 13 hereinabove quoted, with reference to "loading" and "unloading", the defendant reassessed the freight charges on the basis of separate shipments, the difference between the original charges and the charges later assessed being the amount in controversy in this action. The plaintiff paid the charges as reassessed, and brought action in the magistrate Court for recovery of such amounts so paid as overcharges.

The question for decision is, did the plaintiff violate the tariff prohibiting "unloading" by temporarily removing some of the scrap iron from the cars merely to adjust the loads so that it could "complete" the loading?

The decision of the question will turn upon a proper construction of Rule 13 of the applicable tariff schedule.

It seems to be settled that the interpretation of a written tariff stands upon no different footing from that of other written instruments. Nontechnical words are to be given their usual and ordinary signification.

The rule of construction is well stated in *Western Grain Company v. St. Louis-San Francisco Railway Company,* 5 Cir., 56 F. (2d), 160, 161: "Tariffs having as they do the effect of law, the language in them must be construed fairly and reasonably, in accordance with the meaning of the words used, and not distorted or extended by forced or strained construction."

In *Pillsbury Flour Mills Company v. Great Northern Railway Company,* 8 Cir., 25 F. (2d), 66, 68, it is said: "Furthermore, the construction of a railroad tariff is not a matter *sui generis.* It 'presents ordinarily a question of law, which does not differ in character from those presented when the construction of any other document is in dispute.' *Great Northern Railway Co. v. Merchants' Elevator Company,* 259 U. S., 285, 291, 42 S. Ct., 477, 479 (66 L. Ed., 943). While there may be some rules of construction peculiarly applicable to a railroad tariff, yet ordinarily the rules governing the construction of other documents have been applied by the courts to such tariffs."

It is generally held that noncompliance with the tariff provisions will prevent shipments from coming within the scope of the quoted preferential rate. And there is respectable authority to the effect that to bring shipments within the scope of transit arrangements all provisions and conditions of the transit tariff must be strictly complied with. *Smith & Scott, Inc., v. Atchison, T. & S. F. Railway Company,* 192 I. C. C., 593, 597; *Carson Lumber Company v. St. Louis & S. F. Railway Company,* 8 Cir., 209 F., 191.

With these principles of law in mind we come to the consideration of the meaning of the controlling and applicable words of the tariff as applied to the undisputed facts in this case.

The tariff, Subsection (b) of Rule 13, gave the respondent the right to "complete loading" at Greenville, the stop-off point. It further provides that "no freight may be unloaded at the stop-off points". The question then is, under the facts and circumstances of this case,

did the respondent "unload" the scrap iron at Greenville, in violation of the tariff? We do not think so. The evidence shows that scrap iron was removed from the cars solely for the purpose of rearrangement to facilitate complete loading. The freight removed for this purpose was put back on the cars. Obviously there could have been no additional loading or complete loading at Greenville, as permited by the tariff, without a rearrangement of the scrap iron, and if this could not have been effected, then it is plain that the lower rate quoted in the tariff would have been a nullity.

In our opinion, the term "unload", as used in the tariff provision under consideration, connotes a complete and permanent discharge and severance of the freight from the car which contained it. A temporary removal such as was carried out in this case, does not violate the provisions of the tariff, nor the strict compliance rule. A contrary holding would involve a highly technical, strained construction of the meaning of the tariff provision, which we are not disposed to adopt.

Our construction is also clearly in accord with Subsection (c) of the rule.

The appellant also contends that the plaintiff cannot come within the scope of the transit arrangement and enjoy the benefits of the preferential rates, because it subjected certain portions of the scrap iron to the "milling process" of breaking it into smaller pieces. In support of this contention, appellant cites among other authorities, the case of *Washington & C. Railway Company v. Mobile & O. R. Company*, 5 Cir., 255 F., 12. In that case it was held to be in violation of the law for a shipper to stop lumber in transit for remilling or redressing, thereby changing the entire character of the shipment.

This case is not apposite to the facts of the case at bar. The scrap iron did not pass through a milling process, as we understand the term. In a few instances, as shown by the evidence, some of the larger pieces which were projecting over the edge of the gondola car were cut into smaller pieces

by the use of a blow torch. But it would be straining the meaning of words too far to say that this changed the quality or nature of the scrap iron. Before the use of the blow torch, and after, it was still nothing but scrap iron. In no real sense was it changed in form.

We think from our review of the case, that the defendant was without authority to reassess the freight charges. It follows, therefore, that the judgment of the County Court must be affirmed.

Judgment affirmed.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES BAKER and STUKES and MR. ACTING ASSOCIATE JUSTICE WM. H. GRIMBALL concur.